## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 16-61198-CIV-ALTONAGA/O'Sullivan

_____

**SHANE FLAUM**,

                     Plaintiff,

v.

**DOCTOR'S ASSOCIATES, INC.**,

                     Defendant.

_____/

### DOCTOR'S ASSOCIATES, INC.'S MOTION TO EXCLUDE THE
### EXPERT REPORT AND OPINIONS OF DON COKER

Defendant Doctor's Associates, Inc. ( "DAI"), pursuant to Rule 702 of the Federal Rules

of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),

respectfully moves to exclude the expert report and opinions of Plaintiff's proposed expert Don

Coker because:  (1) Mr. Coker is not qualified to offer opinion testimony on the risk of harm to

consumers associated with the printing of expiration dates on debit or credit card receipts and

DAI's compliance with FACTA; (2) Mr. Coker's opinions lack a reliable methodological

foundation; and (3) Mr. Coker's opinions are not helpful to the trier of fact because they merely

repackage impermissible legal opinion as purported expert opinion.

## I.      INTRODUCTION

Plaintiff Shane Flaum filed a one-count Complaint [ECF No. 1] against DAI for violation

of the Fair and Accurate Credit Transactions Act, 15 U.S.C. §1681 *et seq.* ("FACTA"), a subset

of the Fair Credit Reporting Act.  DAI is the franchisor of the popular Subway sandwich shops,

which are independently owned and operated by franchisees throughout the United States.

Plaintiff claims that on or about June 3, 2016, he purchased goods from a Subway store in

Pompano Beach, Florida, and that his printed debit card receipt from that transaction included

the expiration date of his debit card in violation of 15 U.S.C. § 1681c(g).  (Compl. ¶¶ 36-38.)

Plaintiff claims that he and other members of the proposed class are entitled to recover statutory

damages of $100 to $1000 under FACTA, 15 U.S.C. §1681n(a).  He does not seek any actual

damages, only statutory damages. (Compl. ¶¶ 2, 60, 75.)  Nor could Plaintiff seek actual

damages:  in his deposition, excerpts of which are attached hereto as Exhibit A, Plaintiff testified

that he was "educated" by his lawyer to look for receipts with expiration dates, and when he

allegedly received the receipt in question on the afternoon of Friday, June 3, 2016, he promptly

e-mailed his lawyer, who picked up the receipt and filed this case the following Monday, June 6.

(Deposition Transcript of Shane Flaum (Dec. 20, 2017) at 28:12-30:10, 41:23-46:15.)

 Plaintiff has proposed as an expert on liability issues Don Coker, a former banking

industry employee.[1]  A copy of Mr. Coker's Report is attached hereto as Exhibit B.   However,

as Mr. Coker testified during his deposition, the transcript of which is attached hereto as Exhibit

C, he last worked in banking over twenty-five years ago, and during that time had only limited

experience with credit cards and related security issues.  (Expert Report of Donald Coker

["Coker Report"] at pp. 1-4, 53, ¶¶1-10; Deposition Transcript of Donald Coker (Jan. 9, 2017)

["Coker Tr."] at 6:18-7:17; 8:17-10:24.)  Though Plaintiff seeks to offer Mr. Coker's opinions

about the purported risk of identity theft arising from an expiration date on a receipt, Mr. Coker

has no specialized training or knowledge about identity theft or debit or credit card transaction

security, and admits that for the past ten years has made no efforts to inform himself or stay

current with respect to recent developments in the field.  (Coker Tr. at 10:10-24; 25:3-27:14.)

---

[1] Plaintiff does not offer Mr. Coker as a lay witness pursuant to Fed R. Evid. 701 and, as is
apparent from Mr. Coker's Report and Deposition Transcript, Mr. Coker has no independent
knowledge of the facts in this matter.

Indeed, by his own admission, Mr. Coker is almost entirely self-taught on these subjects and his banking experience from thirty years ago did not provide him with any relevant training. (*Id.*)

As shown below, Mr. Coker's testimony does not qualify under any of the requirements of Rule 702. He lacks the specialized training and knowledge that is required of an expert under Rule 702, his testimony is not based on sufficient facts or data, his opinion is not the result of reliable methods reliably applied to the facts of this case, and his opinions are not helpful to the finder of fact. Rather, Mr. Coker simply parrots prepackaged conclusions and conjecture from reports he has recycled for over a decade as a FACTA expert-for-hire. The Court should accordingly exercise its required gatekeeping function and preclude Mr. Coker from testifying.

## II.    MR. COKER IS NOT QUALIFIED TO OFFER TESTIMONY UNDER RULE 702 OF THE FEDERAL RULES OF EVIDENCE.

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In this case, Mr. Coker has offered two opinions, one regarding the supposed risk arising from printing a date on a debit or credit card receipt, and one about the Defendant's alleged violation of FACTA. Stated succinctly, Mr. Coker's first opinion is "that there is a serious risk of harm to consumers from merchants truncating just the legally required digits of a credit card

or debit card account number but not the card's expiration date." (Coker Report at ¶ 1.) Second, Mr. Coker concludes that Defendant failed to act "reasonably" when it allegedly distributed software to some Subway franchisees that caused certain receipts to bear expiration dates. (*Id.* at ¶ 50.) The bulk of Mr. Coker's report is spent supposedly supporting these opinions.

Under Rule 702, the Court is required to act as a gatekeeper and ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S at 597). While the Court retains considerable leeway in its gatekeeping function, it is obligated to "conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). To that end, the Eleventh Circuit has instructed courts to ensure that each expert:

> (1)    is qualified to testify competently regarding the matters he or she intends to address;
>
> (2)    utilizes a sufficiently reliable methodology in reaching his or her conclusions as determined by the type of inquiry required by *Daubert*; and
>
> (3)    offers testimony that assists the trier of fact by applying his or her scientific, technical, or specialized expertise to help determine a fact at issue or otherwise understand the evidence.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (quoting *Frazier*, 387 F.3d at 1260)). The party seeking to introduce and use expert testimony must demonstrate by a preponderance of the evidence that each requirement has been satisfied. *Id.* (citing *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care*, 582 F.3d 1227, 1232 (11th Cir. 2009)).

A.    **Mr. Coker Is Not Qualified to Provide Testimony On The Alleged Risk Arising From An Expiration Date on a Receipt Or The Standard of Care Under FACTA.**

As a threshold matter, Mr. Coker does not possess the necessary qualifications to provide the expert testimony contained in his report: his experience in the banking industry more than twenty-five years ago is either not relevant or too far removed to the opinions he offers in his report. Plaintiff has failed to demonstrate that Mr. Coker is, in the first instance, even qualified to offer opinions as to the risk of identity theft posed to potential class members as a result of the printing of expiration dates on receipts. Nor is he qualified as to the standard of care under FACTA. Given Mr. Coker's lack of qualifications, his report and testimony must be excluded.

Before admitting any expert testimony, a court must first ensure that the proponent of expert testimony can demonstrate that the proffered expert possesses sufficient expertise in the field of his or her testimony. *Frazier*, 387 F.3d at 1260. While Rule 702 permits an expert to testify based upon expertise obtained through training, education, and experience, such expertise must directly correlate to the matters addressed in the testimony proffered by the expert. *Allison v. McGahn Med. Corp.*, 184 F.3d 1300, 1309 (11th Cir. 1999); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (under Rule 702, a witness must have specialized knowledge regarding the area of his testimony). Stated differently, while an expert may possess specialized knowledge on various subjects, an expert may not provide opinion testimony unless that specialized knowledge or experience *directly relates* to the subject of the opinion offered. *Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350, 1358 (S.D. Fla. 2015) (Altonaga, J.) ("expert testimony regarding matters outside of the witness's expertise is inadmissible, even if the expert is qualified to testify about other matters."). This is just such a case.

As he stated in his Expert Report, Mr. Coker was a "high level banker" from 1968 through 1989. (Coker Report at 1-4, 53, ¶¶ 1-10; Coker Tr. at 6:18-7:17.) But despite Mr.

Coker's banking background, he has not had any relevant professional experience related to credit card security for *over thirty years*:  the last time his work involved credit card operations was "probably in '84, '85 or '86, somewhere in there." (Coker Tr. at 9:21-10:3).  And Mr. Coker admitted that the only courses, seminars, or training he has ever participated that related to data security or the technical aspects of debit and credit card processing was when he was a banker – an occupation he left in 1989.  (Coker Tr. at 25:3-26:4.)  Indeed, Mr. Coker all but admitted that his prior banking experience is dated and irrelevant, because, as he testified, "[t]here weren't as many potential problems back then as there are today because, of course, there was no Internet back then so people couldn't do fraud things like they can do on the Internet now."  (Coker Tr. at 9:6-20.)  Instead, Mr. Coker is entirely self-taught on these issues.  (Coker Tr. at 27:11-14 ["Q. So it would be fair to say regarding identity theft, [PCI] DSS, FACTA, you're basically self-taught?  A. Yes, basically."].)

Mr. Coker's experience with credit cards thirty years ago is at best tangentially related to the issues in this case and does not qualify him as an expert under Rule 702.  Recently, this Court recognized that a significant gap in relevant experience can render a proffered expert unqualified to testify as an expert.  *Garcia v. Chapman*, No. 12-21891-CIV, 2014 WL 11822750, at *16 (S.D. Fla. Jan. 29, 2014) (Altonaga, J.).  In *Garcia*, this Court was confronted with an expert offering testimony on Cuban state security policies and practices relating to athletes.  *Id.* at *15. The proffered expert in *Garcia* was one of only eight nationwide directors of the Cuban government's sports program, was the highest-ranking Cuban official to ever defect, and had over twenty-four years of experience that directly related to the subject matter of his testimony. *Id.*  Despite this background, this Court was "not convinced [he] is qualified to testify as an expert" in 2014, because he had not been employed by the Cuban Government since his

defection twenty-two years earlier in 1992.  *Id.* at *16.

As with the expert in *Chapman*, Mr. Coker's relevant work experience ended long ago – almost thirty years – a time when, as Mr. Coker admitted, the credit card industry faced different challenges and the hacking and phishing facilitated by the rise of the Internet were non-existent. Yet despite these fundamental changes in the security landscape of the payment card industry, Mr. Coker has never undertaken any specialized training or education bearing on the major security challenges facing the industry today.  (Coker Tr. at 26:5-27:14.)

Moreover, since Mr. Coker became a full-time expert witness in 1992, his qualifications have severely lagged.  Mr. Coker has not received any specialized education or training in identity theft and the potential risks faced by consumers, or regarding FACTA.[2]  (Coker Tr. at 24:23-26:1.)  Instead, the entire source of Mr. Coker's knowledge into these matters comes from "just training on my own and discussing the matters involved with FACTA with the various attorneys I've worked with . . . ."  (Coker Tr. at 26:5-20.)  The "training on my own," however, is really no more than background reading, divorced from any actual professional experience.

As noted above, Mr. Coker admits that he is "basically self-taught" as to issues of identity theft, FACTA, and industry standards such as PCI DSS (Payment Card Industry Data

---

[2] In contrast, the testimony and report of DAI's rebuttal expert, Richard A. Peters, reveals the existence of a mature ecosystem of training, professional credentialing, and relevant educational programs in payment card transaction security.  As Mr. Peters testified, he possesses professional certifications as a Certified Information System Security Professional, a Certified Information System Auditor, and is designated as a Qualified Security Assessor – with a focus on PCI DSS compliance – by the Payment Card Industry Counsel.  (Deposition Transcript of Richard A. Peters (Jan. 13, 2017) ["Peters Tr."] at 12:11-14:10, a copy of which is attached hereto as Exhibit D.)  The certifications maintained by Mr. Peters all required at least 120 hours of continuing professional education courses each year, and Mr. Peters was required to pass an examination to obtain each of his certifications.  (Peters Tr. at 14:3-10; 15:20-16:22.)  In addition, as part of his typical job duties, Mr. Peters actively monitors criminal activity on the "dark net, underground, black market," to stay abreast of criminal trends and tactics.  (Peters Tr. at 38:6-39:12.)  Mr. Coker has no relevant professional certifications or training in these areas.

Security Standard).  (Coker Tr. 27:8-14.)  And to the extent Mr. Coker possesses any professional or specialized knowledge regarding identity theft or phishing, that knowledge just comes from looking at "banking publications" and "accounts in various media" that Mr. Coker reads, and even merely anecdotal accounts.  (Coker Tr. at 33:1-34:24, 41:23-43:3, 50:21-55:23, 65:4-66:1, 72:6-22, 73:1-74:7, 119:10-120:9, 125:4-15.)  None of these recent articles and accounts appear in the list of materials Mr. Coker relied upon for his report, and indeed his report identifies no articles and only one industry document published since 2008.  (Coker Report at 4-6.)  Mr. Coker testified that he has reviewed "information on identity theft in banking publications that I read, such as Banking Exchange and the American Banker's Journal and American Banker, and some mortgage publications that I get such as Mortgage Servicing News and National Mortgage Review and things like that . . . ."  (Coker Tr. at 34:4-13.)  But this is not a banking or mortgage case; the relevant area is payment card transaction security, and Mr. Coker's reading has no examples from professional literature in that field.  And, when asked how Mr. Coker knows about certain phishing or reverse-engineering techniques criminals use, his only response was "I've certainly read that it's being used, as I said earlier, in various news accounts that I see."  (Coker Tr. at 72:14-18.)

Mr. Coker's cursory self-education does not qualify him under Rule 702.  For example, although Mr. Coker does not follow changes and updates to the PCI DSS as part of his professional work (Coker Tr. at 85:9-19), he nevertheless expresses an opinion that DAI violated PCI DSS requirement 3.3. (Coker Report at ¶ 30.)  Specifically, Mr. Coker's Report states, "it is my opinion that Subway failed to comply with PCI DSS (Payment Card Industry Data Security Standard) Requirement 3.3 [and] had Subway complied with the pertinent sections of the [PCI] contract, its customers would have had better protection from financial and personal damages

than they had due to Subway's failure to comply." (*Id.* at ¶ 30.)

Mr. Coker offered this opinion despite lacking any certifications or specialized training regarding compliance with PCI DSS requirements. (Coker Tr. 27:8-10 ["Q. Do you have any specialized training regarding PCI DSS? A. Just what I've read on my own there."].) Yet the PCI DSS Requirement cited by Mr. Coker has nothing to do with the printing of expiration dates – instead, it deals solely with the printing of primary account numbers (PANs). *See* PCI DSS Requirements, attached hereto as Exhibit E. Indeed, PCI DSS Requirement 3.3 states very clearly that it only requires payment card processors to "mask PAN when displayed (the first six and last four digits are the maximum number of digits to be displayed), such that only personnel with a legitimate business need can see more than the first six/last four digits of the PAN." *Id.* (also stating that "This requirement relates to protection of PAN *displayed* on screens, paper receipts, printouts, etc., and is not to be confused with Requirement 3.4 for protection of PAN when *stored* in files, databases, etc.") (emphasis in original). Mr. Coker stubbornly tried to maintain that Requirement 3.3 somehow incorporated legal requirements regarding expiration dates, but the plain text of the Requirement clearly does not support Mr. Coker's attempt to pull expiration dates into the scope of Requirement 3.3 itself. (Coker Tr. at 88:8-98:3.)

In brief, Mr. Coker's knowledge on the matters that are the subject of his expert opinions is no more than what could be gathered by a lay person reading the same public-domain articles that he has. This alone should make clear that Plaintiff has failed to meet his burden of demonstrating Mr. Coker is qualified by specialized knowledge or experience. Fed. R. Civ. P. 702; *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (expert testimony must present matters "beyond the understanding and experience of the average citizen") *see also Elcock,* 233 F.3d at 741 (noting an expert witness must at least "'possess skill or knowledge greater than the

average layman'" (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir.1998)); *Mercado v. Ahmed*, 974 F.2d 863, 870 (7th Cir. 1992) ("A witness who knows no more than the average person is not an expert."). Yet even in this regard, the information Mr. Coker relied upon for his expert report is woefully out of date.

For example, when asked why the most recent of the articles referenced in his expert report dated from 2008, Mr. Coker stated he did not feel there was a reason to perform additional research because "we all know that identity theft is a problem and it's as big a problem now as it has ever been . . . ."  (Coker Tr. 33:1-34:3; Coker Report at 4-6.)  Mr. Coker was specifically asked about the propriety of offering an opinion in 2017 that took no account of any studies or publications in the intervening eight years, and simply said there was no reason to look at any such materials:

> Q.     But it's your opinion, it's your view that for an expert opinion in a
>        FACTA case commencing in 2016, that limiting the materials
>        relied upon to things published in 2008 or earlier with the one
>        exception is appropriate?
>
> A.     I don't see that any of those things have gone away so I don't see
>        any problem with them.
>
> Q.     You don't see anything possibly changing in between to be worth
>        citing?
>
> A.     I really don't think anything significant is there that I need to see.

(Coker Tr. 34:14-24.)  But for Mr. Coker to have a reasoned basis to assert that nothing has changed, he would need to have taken active steps to stay up-to-date with current developments in data security and identity theft.  He has not.  Instead, he just asserts that nothing has changed, without providing any reason why the Court should accept his claim as true.

In essence, Mr. Coker, who has been proposed as an expert in 55 FACTA cases since 2007, just parrots the content of his ready-made report when plaintiff's counsel calls; as he

admits, his expert report is simply recycled from other expert reports Mr. Coker has been

producing for years.[3]  (Coker Tr. 19-22-20:11 ["I've used the same – every time I have gotten a

FACTA case I've used the report, what I can, from the previous FACTA cases and then made

sure that it conforms to the actual facts of this particular case."].)  But recycling an opinion that

is almost a decade old cannot account for the continuous changes in technology – above all the

growth of the Internet, Internet-based commerce and technology, personal data security, and

criminal methods to undermine data security – that characterize the past ten years.  Indeed,

"EMV" chip card transactions – which lie at the heart of this case – were introduced into the

market long after Mr. Coker had switched to serving as a full time expert.[4]

　　　Mr. Coker's generalized banking knowledge from almost thirty years ago does not render

him qualified to offer opinion testimony on the purported risk of identity theft facing Plaintiff

and the potential class, or the standard of care under FACTA.  Indeed, Mr. Coker's practice of

offering testimony beyond his areas of expertise has seen his testimony excluded in this District

at least once before.  *See Pleasant Valley Biofuels, LLC v. Sanchez-Medina*, No. 13-23046-CIV,

2014 WL 2855062, at *4 (S.D. Fla. June 23, 2014).  In *Pleasant Valley*, the Court excluded Mr.

Coker's opinions as to the duties owed by escrow agents, because Mr. Coker's prior banking

experience did not provide him with sufficient knowledge of the relevant subject.  As the Court

---

[3] For example, paragraphs 36-44 and 46 of Mr. Coker's Report in this matter are largely lifted
from a declaration signed by Mr. Coker on December 7, 2007, and submitted in support of class
certification in a case from 2008 filed by Plaintiff's counsel here.  *See* Declaration of Don Coker,
*Matthews v. United Retail, Inc.*, No. 1:07-cv-2487, ECF No. 34-2 (N.D. Ill. Jan. 2, 2008), at
¶¶ 3-7 (attached hereto as Exhibit F).

[4] "EMV – which stands for Europay, Mastercard and Visa – is a global standard for cards
equipped with computer chips and the technology used to authenticate chip-card transactions."
Sienna Kossman, *8 FAQS ABOUT EMV CREDIT CARDS*, http://www.creditcards.com/credit-card-
news/emv-faq-chip-cards-answers-1264.php (last visited Jan. 24, 2017).  The transactions at
issue in this case were all made using the new EMV technology, which achieved widespread use
in the United States during 2015 and 2016.  *Id.*

in *Pleasant Valley* concluded, "Coker's time in banking may have given him a general impression of the role of an escrow agent, it has not endowed him with a sufficient body of specialized knowledge to assist the trier of fact in understanding the evidence or issues of this case . . . ." *Id.*  The Court should reach the same result here, because as demonstrated above, Mr. Coker's work in banking three decades ago, his at-best tangential experience with payment card security issues at that time, and his failure to keep current with identity theft and hacking issues for at least a decade, all combine to demonstrate that he has practically no specialized knowledge or experience to offer the Court regarding the questions of risk and the standard of care under FACTA.  Mr. Coker's testimony should be excluded for this reason alone.

**B.      Mr. Coker's Opinions Are Unreliable Because They Are The Product Of Speculation And Not The Product Of A Rigorous Methodology As Required By *Daubert*.**

Even if Mr. Coker were found to be qualified as an expert, his opinions are inadmissible because they are neither reliable nor based upon a rigorous methodology as required by *Daubert*. Rule 702 requires experts to utilize reliable methodologies to present reliable conclusions. *Frazier*, 387 F.3d at 1260.  Courts may not permit an expert to offer "speculation, conjecture, or inference that cannot be supported by sound scientific principles." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002).  Instead, the Eleventh Circuit has directed courts to a non-exhaustive list of factors when evaluating the reliability of an expert's proffered testimony, including:

(1)      whether the theory or technique "can be (and has been) tested;"

(2)      whether the theory or technique has been subjected to peer review and publication;

(3)      in the case of a particular scientific technique, ... the known or potential rate of error; and

(4)      whether the theory or technique is generally accepted by the

-12-

relevant scientific community.

*Hendrix*, 609 F.3d at 1194 (quoting *Daubert*, 509 U.S. at 592–94).

These standards apply equally to experts offering non-scientific, experience-based opinions and those offering scientific testimony. *Frazier,* 387 F.3d at 1262 (citing *Kumho Tire*, 526 U.S. at 152). "The key consideration is whether the expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Rider*, 295 F.3d at 1197 (quoting *Kumho Tire*, 526 U.S. at 156). The focus is always on the principles and methodology utilized by the expert, not on the conclusions reached, because the court may not simply "tak[e] the expert's word for it." *Hendrix*, 609 F.3d at 1201 (quoting Fed. R. Evid. 702 adv. comm. note (2000 amend.)); *see also Cordoves*, 104 F. Supp. 3d at 1360 ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Yet taking Mr. Coker's word for it is precisely what Plaintiff asks the Court to do for each of Mr. Coker's opinions.

Rule 702 requires that expert testimony must, in the first instance, be "based on sufficient facts or data." While the advisory committee notes make clear that an expert can rely upon his or her experience in forming opinions, the witness "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 adv. comm. note (2000 amend.). Indeed, this Court has noted that an expert who fails to make his or her sources of facts or data known fails to satisfy the reliability inquiry mandated under Rule 702. *In re Denture Cream Prod. Liab. Litig.*, No. 09-2051-MD, 2015 WL 392021, at *12–13 (S.D. Fla. Jan. 28, 2015) (Altonaga, J.) (collecting cases and holding unreliable expert's testimony and report that was "devoid of any pertinent details or analysis;" the expert failed to point the Court to specific data

or support for otherwise conclusory statements other than referencing "some" or "various" studies he reviewed, without making "clear how many studies [the expert] reviewed and whether he blindly accepted their results."). Mr. Coker fails this test and his opinions should be held to be unreliable.

For example, Mr. Coker repeatedly opines that members of the potential class face an increased risk of identity theft and fraud from the printing of an expiration date on a debit or credit card receipt. (*See, e.g.,* Coker Report at ¶¶ 35-36, 44, 49-50; Coker Tr. 40:18-41:22; 44:1-5). Mr. Coker assert that his opinion is based, at least in part, on: (1) articles that he never identifies (Coker Tr. at 33:1-34:24, 41:23-43:3, 46:7-14, 50:21-55:23, 65:4-66:1, 72:6-22, 73:1-74:7); (b) his bare assumptions regarding what a consumer would find credible (Coker Tr. at 44:19-45:25; 125:16-126:21); and (3) his view of what is, subjectively, "logical," or "obvious." (Coker Report at ¶¶ 36, 44.)  But at no point during his deposition was Mr. Coker able to point to a single study or piece of data that supported his assumptions regarding increased risk. (*See, e.g.,* Coker Tr. at 76:5-9.)  In fact, when Mr. Coker was asked what data and tools would be required to estimate the risk facing Plaintiff and the proposed class members given various hypothetical violations of FACTA, Mr. Coker admitted he had never done any research to support his opinion:

> Q.   Let's explore that a little bit.  If you had been asked to [estimate or quantify the increased risk], what kind of professional tools would you bring to that?
>
> A.   Well I would have to do research on that to see if there is any data out there in terms of the differences between those two and I seriously doubt if there is any data out there on that, but I think that's how you would have to go about that.  I don't think there's any way you can just look at it, the situation of, let's say, this receipt and another receipt that has the full account number shown and say this one is 60 percent more dangerous that the other one or whatever.  I don't think you can really quantify it like that.

> The risk I think is going to be reflected in the credibility that
> somebody making a phishing call or a phishing e-mail or a
> phishing mail inquiry, if people use that anymore, to try to get
> additional information out of a customer, a credit card customer.
> That's basically what you're looking at, is the amount of
> credibility.  If somebody calls up a cardholder and gives them their
> entire card number, reads that back to them, that's going to be
> something that the cardholder is probably going to consider very
> credible.

(Coker Tr. at 44:16-45:15; 125:4-15.)  The fact that Mr. Coker has not done such basic research

is reason to doubt his conclusions as to the relative increases in risk facing Plaintiff and the

potential class.

Throughout Mr. Coker's testimony, he admitted his inability to estimate the increased

risk plaintiff and the potential class allegedly faced.  (*See, e.g.,* Coker Tr. at 52:20-54:13.)  When

specifically questioned regarding the Plaintiff's increased risk of identity theft as a result of

receiving a receipt containing an expiration date, Mr. Coker responded, "Three.  I'm just joking.

No, there's no way to do that."  (Coker Tr. 75:20-75:21).  Mr. Coker even admitted, that "I was

not determining the level of risk, just that there is risk . . . ." (Coker Tr. at 128:10-16.)  And,

when asked to describe risk facing the potential class, Mr. Coker responded that the risk was

simply something other than zero:

> Q.    But when we're talking about risk, we're talking about the risk of
>       that receipt leading to an incident involving some harm and so
>       what I'm trying to get at is what the level of risk of injury is
>       because a receipt contains an expiration date as well as the account
>       number being truncated.
>
> A.    Well, I don't know that you can really put a number on that, but
>       the risk could be zero because the receipts should be properly
>       truncated and then the risk is zero.  I think that's what these cases
>       are primarily about, is the fact that if you do what FACTA says,
>       the risk is zero; if you don't do it, the risk is unknown but it's
>       greater than zero.
>
> Q.    Just to continue that thought, you don't have a methodology to put
>       a number on the risk sitting here today.  Is that correct?

-15-

      A.    No, other than the fact that it's, as I said, greater than zero.

(Coker Tr. at 53:21-54:13.)

Yet the very first opinion offered in Mr. Coker's report stated that consumers faced a "*serious* risk of harm […] from merchants just truncating the legally required digits of a credit card or debit card account number but not the card's expiration date." (emphasis added) (Coker Report at ¶ 1.)  Mr. Coker offers no basis in his report or his testimony connecting his nebulous concept of risk – something just "greater than zero" – to his opinion that those same consumers face a "serious" risk.  Mr. Coker's ultimate equation of "serious" risk with something other than an absolutely zero possibility demonstrates that he possesses *no* methodology – and certainly not one that can satisfy Rule 702's requirements that expert testimony may be admitted only if it is grounded in the "methods and procedures of science" rather than mere "subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  Mr. Coker's jokes and admissions simply underscore his inability to perform the type of analysis required under *Daubert* as to the risk Plaintiff and the potential class actually faced from expiration dates on receipts.

In summary, Mr. Coker presents this Court with nothing more than conclusory assertions about the risk facing Plaintiff and the potential class.  Just as this Court excluded opinion testimony from plaintiff's expert in *In re Denture Cream*, it should do so here.  Mr. Coker's opinions are supported by nothing more than his say-so, what Mr. Coker claims to be common sense, or by reference to articles or reports that Mr. Coker cannot identify. (Coker Tr. at 33:1-34:13, 41:23-43:3, 44:16-45:25, 46:7-14, 49:19-55:23, 65:23-66:1, 72:14-22, 73:1-74:7, 119:18-120:9, 125:4-15; Coker Report at ¶¶ 36.)  The Court must require more than the expert's fiat in order to admit opinion testimony – hard sources, studies, data, and real experience must be applied rigorously to the facts of each case.  Mr. Coker's recycled and unsubstantiated opinions are simply not reliable enough to satisfy the standards set forth by the Supreme Court in *Daubert*

and *Kumho Tire*.

**C.    Mr. Coker's Opinions Do Not Assist The Trier Of Fact.**

Finally, Mr. Coker offers numerous opinions that fail to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Civ. P. 702(a). Expert testimony is helpful when it addresses "matters that are beyond the understanding of the average lay person . . . ." *Frazier*, 387 F.3d at 1262. Conversely, expert testimony is *not* helpful – and an expert must be precluded from testifying – if the expert offers an opinion as to "the legal implications of conduct," because "the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1541 (11th Cir.1990).

As this Court recently noted, if an expert's testimony tracks the language of a particular statute or make use of terms with specialized legal meanings, that testimony is not helpful because it is an impermissible legal conclusion. *Cordoves*, 104 F. Supp. 3d at 1365 (citing *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997)). Indeed, in *Cordoves*, this Court relied on *Pleasant Valley* – an opinion that excluded Mr. Coker's expert testimony as improper and unhelpful – to support its conclusion that "an expert witness may not testify as to the state of the law . . .; this is the Court's duty." *Id.* (quoting *Pleasant Valley*, 2014 WL 2855062, at *5). The reasoning of *Cordoves* and *Pleasant Valley* applies equally to this case, where Mr. Coker again offers similarly unhelpful legal opinion throughout his testimony and report.

This Court need look no further than Mr. Coker's answer to the question of what he was asked to do as an expert in this case to understand just how unhelpful Mr. Coker's opinions are to the to the trier of fact. Mr. Coker's answer leaves no room for doubt that his opinions improperly restate legal conclusions. (Coker Tr. at 34:25-35:5 "Q. Tell me what you were asked to do in this case. A. Simply to look at the facts, and that's pretty simple. I was given a receipt

and give an opinion on whether or not it complies with FACTA and I said it does not.")  And throughout Mr. Coker's testimony and Report he repeatedly makes improper use of terms of specifically legal import, reaching impermissible legal conclusions that cannot be allowed to go to the jury.  For example, Mr. Coker testified that:

- "After reviewing the documents, it is obvious to me, and it is my opinion that Doctor's Associates, Inc., d/b/a/ Subway ("Subway") *failed to exercise ordinary care to a degree such as a company utilizing ordinary prudence would exercise under the same circumstances.*" (Coker Report at ¶ 27 (emphasis added));

- "It is my opinion that it was *extremely careless and reckless* for Subway to *fail to use even slight care* in implementing and monitoring changes to its IT system knowing full well that it was risking serious consequences not only to its customers but to itself as well." (Coker Report at ¶ 32 (emphasis added));

- "This apparently widespread *violation of FACTA* was not an accident but rather was simply a *failure to act* when it should have." (Coker Report at ¶ 34 (emphasis added));

Mr. Coker's use of legal terms is no accident.  Indeed, at deposition Mr. Coker admitted that he knew that Courts bar experts using such terminology, but he proceeded to pepper his Report with them anyway:

Q.  Are you rendering an opinion that as a legal matter Doctor's Associates was reckless to fail to use what you call even slight care in implementing and monitoring changes to its IT system?

A.  Well, I'm using those words, but I'm not really intending to give an opinion on law there because I don't think judges like for experts – for lawyers to do that.  I mean, I'm a banker, I'm not a lawyer, but I can still use the word reckless or careless or whatever.  That's why I think that it's – that's why I used the words I used there.

Q.  Are you aware that the term reckless is sometimes used as a legal criterion for a willful violation?

A.  Sure.

(Coker Tr. at 123:10-20.)

Mr. Coker's efforts to utilize legal terminology are not limited to this matter. Indeed, in other cases Mr. Coker has used the same tactic. *See, e.g.*, *Pleasant Valley*, 2014 WL 2855062, at *5 (excluding Mr. Coker's expert report of because, *inter alia*, it offered impermissible legal opinions as to the legal duty one party owes to another); *FNB Bank v. Park National Corp.*, 996 F. Supp. 2d 1187, 1191-92 (granting motion *in limine* to exclude testimony from Mr. Coker as to the legal effect of liens and proper legal interpretation of contracts); *see also* Deposition Transcript of Don Coker, *Legg v. Laboratory Corp. of Am. Holdings*, No. 14-cv-61543, ECF No. 144-1 (S.D. Fla. June 5, 2015), at 44 (excerpts attached hereto as Exhibit G) ("Q. Has a court ever excluded any portion of your testimony or your testimony altogether for any reason? A. There have been a few cases where I have had to, like – the attorneys had me give a legal – my interpretation of a legal document or a legal term and a judge doesn't like for a non-lawyer to do that. So I've had two or three of those in the past, maybe two."). Mr. Coker was not permitted to offer legal conclusions dressed up as opinion testimony in *Pleasant Valley* and *FNB Bank*, and he should not be permitted to do so here.

## III.    CONCLUSION

For the foregoing reasons, Doctor's Associates, Inc., respectfully requests that the Court exclude the expert report and opinions of Don Coker. Mr. Coker is not qualified to offer the opinions contained in his report, Mr. Coker's opinions are not reliable, and Mr. Coker's opinions will not assist the trier of fact.

Respectfully Submitted,

HARGROVE LAW GROUP

s/John R. Hargrove
John R. Hargrove
Fla. Bar No. 0173745
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Ph. 561.962.4191
Fax 866.637.2804
jrh@hargrovelawgroup.com

in association with

MONTGOMERY MCCRACKEN
WALKER & RHOADS, LLP
Peter Breslauer
123 South Broad Street
Philadelphia, PA 19109
Ph. 215.772.7271
pbreslauer@mmwr.com

*Attorneys for Defendant*
*Doctor's Associates, Inc.*

## LOCAL RULE 7.1(a)(3) CERTIFICATION

Counsel for Defendant conferred with Counsel for Plaintiff on January 24, 2017

regarding the relief requested herein. Plaintiff stated that he opposes this motion.

/s/ John R. Hargrove

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on January 24, 2017, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document

is being served this day on all counsel of record via transmission of Notices of Electronic Filing

generated by CM/ECF.


/s/ John R. Hargrove